**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **SOUTHERN REGIONAL HEALTH** | ) | **PROPOSED** |
| **SYSTEM, INC., d/b/a/ SOUTHERN** | ) | **Jointly Administered Under** |
| **REGIONAL MEDICAL CENTER, et al.,** | ) | **CASE NO. 15-64266-wlh** |
| | ) | |
| **Debtors.** | ) | |

**DECLARATION OF KIMBERLY J. RYAN**
**IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS**

I, Kimberly J. Ryan, declare under penalty of perjury as follows:

1.

Beginning October 13, 2014, I became the President and Chief Executive Officer of Southern Regional Health System, Inc., a nonprofit corporation duly organized under and existing pursuant to the laws of the State of Georgia. In this capacity, I have obtained detailed knowledge of and experience with the business and financial affairs of Southern Regional Health System, Inc., d/b/a Southern Regional Medical Center ("**Southern Regional**"), as well as the following direct or indirect wholly owned subsidiaries of Southern Regional: Southern Crescent Physicians' Group, Inc., ("**SCPG**"); Southern Crescent Real Estate, Inc., ("**SCRE**"); Southern Regional Ambulatory Surgery, Inc., ("**SRAS**"); Southlake Ambulatory Surgery Center, L.L.L.P., d/b/a Mount Zion Surgery Center, a/k/a Spivey Station Surgery Center ("**Spivey Station**"); and Southern Regional Medical Services, Inc., ("**SRMS**"), each a debtor and debtor-in-possession (collectively, the "**Debtors**").

2.

I am authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined).  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided by employees under my supervision or professionals retained by the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  Opinions regarding compliance with applicable statutes or rules are based upon advice of counsel.  If I were called upon to testify, I would testify competently to the facts set forth herein.

### **Background**

3.

On July 30, 2015 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.

Southern Regional is a 331-licensed bed full-service hospital managed by Emory Healthcare, Inc. pursuant to the terms of a   Management Services Agreement as amended. Located in Riverdale, Georgia, the hospital serves residents throughout the region south of Atlanta and has been recognized on the State and National level for the quality of care provided. Southern Regional holds the distinction of being certified as an accredited Chest Pain Center and

an Advanced Primary Stroke Center.    Southern Regional is also recognized as an Accredited

Center for Metabolic and Bariatric Surgery by the American College of Surgeons.

5.

As a leader in neurologic, heart & vascular, bariatric, and women's healthcare services,

Southern Regional's medical staff is comprised of over 480 physicians that blend their passion

for healing with advanced technology to offer the latest procedures and treatments.    Additionally,

Southern Regional has become known as a leader in women's healthcare services and offers a

full range of services at the Women's Life Center. The center's experienced staff delivers over

2,800 babies annually making it a top choice for expectant mothers throughout south Metro

Atlanta. Services include a Level III Neonatal Intensive Care Unit (NICU) which provides

specialized care for critically ill or premature newborns.

6.

In addition to hospital based services, Southern Regional offers ambulatory care services

at a second campus, Spivey Station, located in Jonesboro, Georgia.    The facilities include:

Spivey Station Surgery Center, which provides ambulatory surgical care; The Women's Center,

a dedicated breast imaging center; and Advanced Imaging, a fully digital medical diagnostic

center with advanced modalities such as Magnetic Resonance Imaging (MRI) and Computerized

Tomography (CT).

7.

In    early    2014,    Southern    Regional    embarked    on    an    organization-wide    business

performance improvement initiative. The objectives of this initiative included improving the

financial performance of the Debtors, and led to the implementation of cost reductions

throughout the hospital, which were estimated to save the organization approximately $12 million per year.  Additionally, with the passage of a Special Purpose Local Option Sales Tax (SPLOST), Southern Regional was able to retire the Hospital Authority's bonds, saving Southern Regional $3 million annually in debt service costs.  Retirement of this debt allowed funds otherwise needed for debt service to be used for hospital operating expenses.  SPLOST funds were also allocated for a $1.6 million heating and cooling infrastructure project, which was essential to hospital operations.  Additionally, Clayton County provided support to the hospital by providing $7.9 million for Fiscal Year 2015 to help partially offset the costs of indigent care provided by Southern Regional.  These payments ended in June of 2015.

8.

Despite continued cuts in staffing and operational costs, the Debtors continue to struggle financially for a number of reasons.  Two of the principal reasons are as follows.  First, the cost of uncompensated care is a significant burden to the entire Clayton County community, but especially to Southern Regional. The hospital is legally required to treat a large number of patients who have no insurance and this trend continues to escalate. In fiscal year 2014, the cost of uncompensated care to Southern Regional was in excess of $21 million.  Second, while uncompensated care is increasing, compensated care continues to decline.

9.

In an effort to find a lasting solution to the Debtors' financial challenges, Southern Regional's Board of Directors and Clayton County hired a nationally recognized healthcare consulting firm to evaluate all viable strategic options, including identifying potential strategic financial partners for the hospital.   After evaluating alternatives, conducting an exhaustive sale

- 4 -

process and consulting with their advisors and directors, the Debtors eventually concluded that it was in their best interest, and the interests of their creditors and employees, to seek protection under Chapter 11 of the Bankruptcy Code, and hopefully effectuate a transaction whereby the Debtors will be able to continue to provide vital healthcare services to the surrounding community while also preserving vital jobs and supporting the local economy.

### The First Day Motions

10.

In conjunction with their bankruptcy petitions, the Debtors filed the motions and applications listed on <u>Exhibit A</u> (collectively, the "**First Day Motions**"). I submit this declaration in support of the First Day Motions. I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief, through my review of various materials and other information, communications with other employees, agents and representatives of the Debtors with relevant knowledge, and my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

11.

As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to

continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

12.

As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors-in-possession.

**<u>Motion for Joint Administration</u>**

13.

The Debtors are requesting that the Court jointly administer the six (6) related bankruptcy cases in order to promote judicial efficiency and to minimize the administrative expense to each of the Debtor's estates.  Southern Regional Health System, Inc., d/b/a Southern Regional Medical Center, is the parent or grandparent company of: (i) Southern Crescent Physicians' Group, Inc.; (ii) Southern Crescent Real Estate, Inc.; (iii) Southern Regional Ambulatory Surgery, Inc.; (iv) Southlake Ambulatory Surgery Center, L.L.L.P., d/b/a Mount Zion Surgery Center, a/k/a Spivey Station Surgery Center;  and (v) Southern Regional Medical Services, Inc., which are all direct or indirect subsidiaries of Southern Regional and sister companies of each other.   Joint administration and the maintenance of a single docket will streamline the bankruptcy process, minimize confusion among the creditor body from receipt of multiple pleadings for each Debtor and minimize the administrative expense to the Debtors' estates.

Therefore, joint administration is in the best interest of the Debtors, their creditors and their estates.

### Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals (the "Compensation Procedures Motion")

14.

The Debtors believe that the relief requested in this Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in this case more effectively.

15.

Briefly stated, the requested procedures would permit each Professional to serve upon counsel for the Debtors, and the Office of the United States Trustee a statement of fees and expenses incurred by the Professional during the preceding month (a "**Monthly Statement**"). Subject to the terms and conditions of any order granting the Debtor-in-Possession (DIP) Financing Motion and/or Cash Collateral Motion (defined below), the Debtors would be authorized to pay each Professional the fees and expenses requested in the Monthly Statement in the absence of an objection received within ten (10) days after service of the Monthly Statement. All fees and expenses of each Professional, whether or not paid or objected to in connection with a Monthly Statement, would remain subject to review and approval by the Court in connection with interim and final fee applications under Sections 330 and 331 of the Bankruptcy Code.

16.

The Debtors propose that these procedures also apply to members of any official committee appointed in this case seeking reimbursement of expenses pursuant to Section 503(b)(3)(F) of the Bankruptcy Code.  However, these procedures will not apply to professionals

retained in the ordinary course of business pursuant to a separate motion, or those retained

pursuant to 28 U.S.C. § 156 (in the case of the claims agent).

### Application for Authority to Retain Kurtzman Carson Consultants LLC as Claims, Noticing, and Balloting Agent for the Debtors (the "KCC Retention Motion")

17.

The Debtors believe it is necessary and in the best interests of their creditors and estates

to engage Kurtzman Carson Consultants LLC ("**KCC**") to act as outside agent to the Clerk of the

Bankruptcy Court to assume full responsibility for the distribution of notices and proof of claim

forms and the maintenance, secondary processing, and docketing of all proofs of claim filed in

the Debtors' bankruptcy cases.  KCC provides comprehensive bankruptcy management services,

including data processing, noticing, claims processing, and other administrative tasks in Chapter

11 cases.  In addition, in connection with any plan of reorganization proposed by the Debtors, the

Debtors have determined that they will require the services of KCC with respect to the mailing of

the Debtors' disclosure statement, plan, and ballots and in maintaining and tallying the ballots in

connection with the voting on such plan.

### Motion of the Debtors for Approval of Notice Procedures (the "Notice Procedures Motion")

18.

Hundreds of creditors and parties in interest may be technically entitled to receive notice

in these cases.  To require the Debtors to provide notice of all pleadings and other papers filed in

these cases to these parties in interest would be extremely burdensome and costly to the Debtors'

estates as a result of the photocopying, postage, and other expenses associated with such large

mailings.  Accordingly, the Debtors believe that the notice procedures requested in the Notice

- 8 -

Procedures Motion are in the best interests of their estates and creditors, and will not prejudice the rights of any party in interest in these cases.

### Motion for Authority to (A) Maintain Existing Bank Accounts and Cash Management System, and (B) Continue Use of Existing Business Forms (the "Cash Management Motion")

19.

Prior to the commencement of these Chapter 11 cases, the Debtors maintained approximately thirty-five (35) bank accounts with various depository institutions, a schedule of which is attached to the Cash Management Motion as Exhibit A.  It is critical for the Debtors to be able to continue their existing cash management system (as modified by any debtor-in-possession financing or cash collateral arrangement approved by this Court) during the pendency of these Chapter 11 cases.  Any disruption to the Debtors' ordinary business affairs at this critical stage in the reorganization process could adversely impact their ability to successfully reorganize.

20.

The Debtors' pre-petition bank accounts and business forms are integrally related to the Debtors' cash management system.  Thus, maintenance of the Debtors' current accounts and forms is necessary to avoid delays, confusion, and disruption of the Debtors' business.

### Motion for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-Petition Premiums and Related Obligations (the "Insurance Motion")

21.

In connection with the operation of their business, the Debtors maintain various insurance policies and programs (collectively, the "**Insurance Programs**") through several different

insurance carriers (the "**Insurance Carriers**").  Exhibit A to the Insurance Motion is a summary

of the Debtors' various insurance policies, including a list of the Insurance Carriers, policy

terms, and the aggregate annual premiums due thereunder.

22.

The Debtors' Insurance Programs include liability and property insurance policies, which

provide the Debtors with insurance coverage relating to, among other things, general liability,

professional liability, directors and officers liability, workers' compensation, business

automobile, and property.

23.

The Debtors are required to pay premiums based upon a fixed rate established by the

Insurance Carriers.  The premiums for these policies are determined annually and most, if not all

of these, are either (i) directly billed to the Debtors in monthly installments or (ii) financed by the

Debtors pursuant to a premium finance agreement.

24.

As of the Petition Date, the Debtors believe that they are current on pre-petition

premiums with respect to the Insurance Programs.  To the extent there is an outstanding

insurance policy premium for the pre-petition period, however, the Debtors seek authority to pay

the pre-petition premium in the ordinary course and as such payments are necessary to keep the

Insurance Programs in force.

25.

It is essential to the continued operation of the Debtors' business and their efforts to

reorganize that the Insurance Programs be maintained on an ongoing and uninterrupted basis.

- 10 -

The failure to pay premiums when due may affect the Debtors' ability to renew the insurance policies.  If the insurance policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ongoing business operations.  Such a result would also place at risk the estates' assets that are necessary to satisfy secured and unsecured claims.

### Motion for Authority to Pay Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses and Other Compensation to Employees and Independent Contractors (the "Wages and Benefits Motion")

26.

As of the Petition Date, the Debtors employed approximately 1350 employees and independent contractors.

27.

The Debtors have incurred certain pre-petition obligations that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date.  Even though arising prior to the Petition Date, these obligations (collectively, the "**Obligations**") will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date.  These obligations can generally be categorized as follows: (i) wages, salaries, and other compensation; (ii) payroll taxes; (iii) qualified 403(b) plan obligations; (iv) health and welfare benefits; and (v) other benefits.

28.

Pursuant to Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, a debtor's

- 11 -

employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within one hundred eighty (180) days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within one hundred and eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent the claims do not exceed $12,475.  11 U.S.C. §§ 507(a)(4)–(5).  As of the Petition Date, the Debtors believe that there are 4 employees for whom the Payroll Obligations would exceed $12,475.

29.

Any delay in paying the Obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely in order for their businesses to be successful. The Debtors must have the support of their employees in order for the Debtors to maximize the going concern value of their assets.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

30.

Moreover, absent an order granting the relief requested in this Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.  The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

## Motion for Authority to Use Cash Collateral (the "Cash Collateral Motion")

31.

Gemino Healthcare Finance, LLC ("**Gemino**") made certain loans to one or more of the Debtors pre-petition for which it contends it is owed in excess of $10 million.  In connection therewith, Gemino may assert liens and security interests in some or all of the Debtors' personal property used in the operation of their businesses (the "**Property**"), which consists of, *inter alia*, accounts, inventory, furniture, fixtures and equipment, and general intangibles.  Gemino may also assert that the proceeds received from Property consisting of inventory and accounts receivable is "cash collateral" as defined in 11 U.S.C. § 363(a).  Additionally, U.S. Foods, Inc. (collectively, with Gemino, the "**Secured Creditors**") may assert a security interest in the Property (and said cash collateral) pursuant to the terms of a customer account application as security for a claim against the Debtors in the approximate amount of $60,000.

32.

The Debtors' use of the cash collateral is essential to the continuing operation of their business, to maintain the value of the Property and other assets and for an effective reorganization.  Without use of cash generated from patient accounts receivables and other revenues, the Debtors will not be able to pay their physicians, nurses and other employees, vendors, and landlords, and would be forced to cease operations, in which event they would be unable to reorganize.  For these reasons, immediate access to cash collateral by the Debtors is critical.

33.

The Debtors believes that the Secured Creditors are adequately protected by virtue of the

- 13 -

value of the collateral they hold as security for their respective claims.  Nonetheless, the Debtors are prepared to offer adequate protection to the Secured Creditors in the form of replacement liens as described in the Cash Collateral Motion.  In addition, the Debtors are proposing that their use of cash collateral would be limited to necessary expenses in accordance with a proposed budget, a copy of which is attached as an exhibit to the Cash Collateral Motion.

**Motion for Order Shortening Notice and Expediting
Hearing on First-Day Motions (the "Expedited Hearing Motion")**

34.

The relief requested in the Expedited Hearing Motion is necessary to ensure that there is no interruption in the services being provided by the Debtors or damage to the Debtors' businesses or the value of their assets.  To require the Debtors to comply with otherwise applicable notice requirements would cause immeasurable harm to the Debtors' ability to efficiently and effectively manage their operations, would create disruptions in the timely payment of obligations, and would threaten the Debtors' existence in light of their current condition.  Accordingly, the Debtors believe that the relief requested in the Expedited Hearing Motion is warranted.

**Conclusion**

Accordingly, for the reasons stated herein, and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

- 14 -

Executed this 31ˢᵗ day of July, 2015.

Kimberly J. Ryan
Chief Executive Officer of Southern Regional
Health System, Inc.

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§152 and 3571.

## EXHIBIT A

## INDEX OF FIRST DAY MOTIONS

| | |
|---|---|
| 1. | Motions for Joint Administration |
| 2. | Motion of the Debtors for Approval of Notice Procedures |
| 3. | Motion for Authority to Retain Kurtzman Carson Consultants LLC as Claims, Noticing, and Balloting Agent for the Debtors |
| 4. | Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals |
| 5. | Motion for Authority to (A) Maintain Existing Bank Accounts and Cash Management System, and (B) Continue Use of Existing Business Forms |
| 6. | Motion for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-Petition Premiums and Related Obligations |
| 7. | Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses, and Other Compensation to Employees and Independent Contractors |
| 8. | Motion for Authority to Use Cash Collateral |
| 9. | Motion for Order Shortening Notice and Scheduling Expedited Hearing on First-Day Motions |
| 10. | Declaration of Kimberly J. Ryan in Support of First Day Applications and Motions |